UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 12-3109(DSD/JSM)

Denson International Limited,

Plaintiff,

v.

**ORDER**

Liberty Diversified
International, Inc., d/b/a
Safco Products Company,

Defendant.


Tiffany A. Blofield, Esq., Wintrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402, for plaintiff.

William R. Stoeri, Esq. and Meghan L. DesLauriers, Esq., Dorsey & Whitney LLP, 50 South 6th Street, Suite 1500. Minneapolis, MN 55402, for defendant.


This matter is before the court upon the cross-motions for summary judgment by defendant Liberty Diversified International, Inc. (LDI) and plaintiff/counterclaim defendant Denson International Limited (Denson). Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants both motions.[1]


**BACKGROUND**

This commercial dispute arises out of the parties' business

---

[1] Denson also moves to strike the testimony and report of LDI's expert witness, Arthur Hill. ECF No. 146. Because the court grants summary judgment without relying on Hill's report or testimony, it denies as moot the motion to exclude.

relationship.   LDI is the parent company of Safco Products Co. (Safco), which sells office furniture and equipment.  Between 2004 and July 2012, LDI also owned and operated Valley Craft, Inc., which manufactures and sells metal hand trucks.[2]  Denson, a now-defunct Hong Kong  trading company, contracted with Chinese manufacturers to produce office equipment and furniture.  Denson then sold the finished products to companies like LDI.

## I.    The Parties' Business Relationship

In 1992, LDI retained Denson to coordinate with several factories in China to manufacture office products.  Duffy Decl. ¶ 8.  Generally, LDI would send drawings or samples of its desired products to Denson, which would then identify a Chinese manufacturer to manufacture the products.  Mandigo Dep. at 35:9-23. Denson also negotiated wholesale prices with the manufacturer and conducted quality control.  Duffy Decl. ¶ 9.  These tasks were primarily performed by Denson's former Operations Manager, Vincent To.  Duffy Decl. ¶¶ 9-13.

Two Chinese factories - EKO Factory and Nanjing Lanqu Import & Export Limited factory (Nanjing Factory) - manufactured the "vast majority" of the products that Denson sourced on behalf of LDI, and specifically Safco.   Weil  Affirmation ¶ 21.   Denson also coordinated with three smaller Chinese manufacturers.   Id.

---

[2] For ease of reference, the court will refer to LDI, Safco, and Valley Craft collectively as "LDI" unless a finer distinction is required.

Although Denson was LDI's main contact in China, LDI would coordinate with other brokers when it believed that Denson's prices were too high.  Mandigo Dep. at 30:2-6, 32:5-15.  In April 2008, LDI opened an office in Shanghai and began directly purchasing products without Denson's involvement.  Id. at 29:15-18, 33:18-21; DesLauriers Decl. Exs. 8-12.  LDI eventually stopped purchasing through Denson altogether.

## II.  Facts Relating to Denson's Claims

In March 2007, Vincent To contacted LDI employees Phil Mandigo and Pam LaFontaine to discuss potential employment with LDI.  See Krummen Decl. Ex. 32, at LDI 2495.  To maintain confidentiality, To communicated through a private email account, over the telephone, and in person.  See, e.g., id. at LDI2495, LDI2493; Ex. 36. Initially, To offered to manage LDI's planned operations in China. On April 17, 2008, LaFontaine asked To make estimates of LDI's projected monthly expenses.  DesLauriers Decl. Ex. 14.   To responded with general ideas on salary, staffing, and production control, and estimated that he could save LDI ten percent annually. Id. Ex. 15.  LaFontaine responded that "when we have taken product lines and quoted them elsewhere we have seen around 35% savings." Duffy Decl. Ex. 8, at DENSON 432.   LaFontaine rejected To's proposal on May 22, 2008, stating that LDI had already opened an office in Shanghai and expected to begin operations by the end of the summer.  DesLauriers Decl., Ex. 17.

Approximately two years later, To offered to work for LDI as a consultant and help move "the Safco manufacturing business from Denson and direct to the original vendors and factories." Id. Ex. 18, at DENSON 33.  When LDI rejected this proposal, To offered to serve as a broker for the three smaller Chinese factories that made products for Safco.  Id. Ex. 19.  LaFontaine asked if To could provide a list of items and prices that would be covered under the arrangement. DesLauriers Decl. Exs. 20, 21.  On April 21, 2011, To sent LaFontaine a "prices list of the remaining products from the three factories." Id. Ex. 23, at DENSON 1.  The document stated that "specification, requirement, quality and packaging will be [the] same as Denson shipments ...." Id. at DENSON 3.  The prices were between five and fifteen percent lower than the prices that Denson charged LDI.  Weil Affirmation ¶ 42(ii-iii).  LDI accepted the proposal, and TO resigned from Denson in May 2011.  Id. ¶ 32. Denson sued To in Hong Kong shortly thereafter, and the parties settled in August 2012.  DesLauriers Decl. Exs. 24, 25.  As part of the settlement, To admitted that he breached his fiduciary duties to Denson.  Id. Ex. 25.  He denied however, that he "ever disclosed, divulged or provided copies or extracts of any of [Denson's] confidential information or trade secrets." Id. Ex. 27 ¶ 11.

## III. Facts Relating to LDI's Counterclaims

In December 2004, the United States Department of Commerce

issued an antidumping order that set a 383.6 percent duty rate on most Chinese exporters and manufacturers of hand trucks. Second DesLauriers Decl., Ex. 1. At the time, Denson had been coordinating with Chinese factories to manufacture and ship hand trucks for Valley Craft. Some of the hand trucks were manufactured by nonparty Qindao Taifa Group Co. (Taifa), a factory in northern China that was subject to a lower antidumping duty rate of approximately thirty percent. Id. Ex. 2  Other hand trucks, however, were manufactured by a factory subject to the higher duty rate. Id. Taifa would only fulfill large quantity orders, so when Valley Craft needed a small quantity of hand trucks, Denson coordinated the orders with EKO Development, a distributor located in Guangzhou, China. See Duffy Dep. at 148:3-17, 149:21-24. EKO would purchase hand truck orders in bulk from Taifa, and Denson would then sell them to Valley Craft. See id.

Vincent To informed Valley Craft that Denson could move the manufacture of all of its hand trucks to Taifa to avoid the higher duty rate. Second DesLauriers Decl. Ex. 2. In order to comply with the Customs order, Valley Craft asked that Denson provide the name and address of the factory, and to include the applicable anti-dumping case number on each invoice. Id. Ex. 4, at DENSON 7550. Valley Craft agreed that it would be sufficient to "send a declaration letter" for each shipment that would include "Taifa's name, address, the case number and all the models and quantities

5

shipped[.]"  Id. at DENSON 7549.

From 2005 to 2007, the invoices for all transactions stated that the hand trucks were "produced by Qingdao Taifa Group Imp[.] & Exp. Co., Ltd. with the Anti-Dumping Case Number A56-891-004." See Handler Decl. Ex. 5; Second DesLauriers Decl. Exs. 7-12; Duffy Dep. 192:22-24.  At least some of these shipments also included a certificate stating that the hand trucks were sold by Taifa to Denson.  See, e.g., Handler Decl. Exs. 4, 35, 36.[3]

In January 2008, Customs rejected a shipment to Valley Craft because the invoice did not include an antidumping clause.  Handler Decl. Ex. 6; Second DesLauriers Decl. Ex. 13, at DENSON 7590-91. Valley Craft contacted Vincent To to inquire about the missing clause.  Second DesLauriers Decl. Ex. 13, at DENSON 7590.  To first responded that Denson believed the higher duty rate did not apply to the particular hand trucks purchased by Valley Craft.  Id.  To later admitted, however, that he had make a mistake and that the higher duty rate did in fact apply.  Handler Decl. Ex. 7. Specifically, To explained that the hand trucks at issue were manufactured by a "sister company (in south China) of Taifa (in North China)" and that "Taifa would not accept orders for new items

---

[3] Denson claims that it cannot locate certain documents, including specific certificates of sale, that are almost a decade old.  Countercl. Def.'s Reply Mem. at 9.  As a result, although Denson has produced a number of certificates of sale, only a few correspond to the 2005 to 2007 transactions at issue in this case. See, e.g., Handler Decl. Ex. 35, at DENSON 553, 7393 (corresponding to purchase order numbers 91229 and 97189).

and in small quantities and our factory in the south could not add the clause any more." Id. LaFontaine told Valley Craft that she could use LDI's collective buying power to ensure that Denson put the clause back on the invoices. Id. Exs. 8-9. That same day, LDI asked Denson to include language indicating that the orders were "exempt from the anti-dumping clause." Id. Ex. 10.

To responded on April 3, 2008, stating "[p]ursuant to your request, [Denson] will arrange the shipment of this order and will put the statement that these carts are exempt from the anti-dumping series." Id. Ex. 11. Denson's next invoice, dated April 10, 2008, stated simply that "these carts are exempt from the anti-dumping series." Id. Ex. 13. The invoice did not state, however, that the hand trucks were manufactured by Taifa, nor did it include Taifa's specific antidumping case number. Id. On October 14, 2008, Denson sent a second invoice that included identical language. Id. Ex. 14. Before the shipment, Valley Craft asked To if the hand trucks would be subject to the higher antidumping rate. Id. Ex. 15, at DENSON 7655. To responded that the hand trucks were "in the list" but that "there should be no problem" because "this factory in south China is not famous (compare[d] with Taifa) and lastly your order quantity is small." Id.

In December 2008, customs rejected the hand truck shipment corresponding to the October purchase order. Id. Ex. 18. Valley Craft contacted To, who disclosed that Yangjiang Shunhe Industrial

Co. Ltd (Yangjiang) had produced the hand trucks.   Id. Ex. 19; Second DesLauriers Decl. Ex. 15.   To further explained that the "products were manufactured in south China ... and all shipped products are [on] the anti-dumping list."   Handler Decl. Ex. 19. He claimed that he "just followed the instruction from Valley Craft to add the statement in the shipping documents[.]"   Id.

Customs sent LDI a Notice of Action in February 2009, informing the company that it was under investigation for failing to pay antidumping duties.   Id. Ex. 23, at LDI 246.   LDI conducted an internal investigation and responded to Customs on October 13. Id. at LDI 237.   LDI informed Customs that there was "inconsistent and/or incomplete underlying documentation" to prove that certain hand trucks shipped between 2005 and 2009 were manufactured by Taifa.   Id. at LDI 241.   On July 23, 2012, Customs sent a Notice of Penalty to LDI, alleging that the company failed to identify or state the correct antidumping case numbers on some of its purchases.   Id. Ex. 26, at LDI 2916.   The notice further alleged that the "violation ... occurred as a result of negligence."   Id. On August 2, 2012, LDI sent a letter and check for $1,252,045 to Customs, stating that the payment was to "resolve all liabilities with respect to importations made by Valley Craft, Inc."   Id. at LDI 2915.

## IV.   Procedural History

Denson filed suit against LDI on December 13, 2012, alleging

misappropriation of trade secrets and willful and malicious
misappropriation of trade secrets.  LDI filed counterclaims,
alleging fraudulent misrepresentation, fraudulent omission, and
breach of contract.  Denson moved for summary judgment on the
counterclaims and the court granted the motion only as to the
breach-of-contract claim.  Denson now again moves for summary
judgment, and LDI moves for summary judgment on the
misappropriation claims.

## DISCUSSION

### I.   Standard of Review

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
A fact is material only when its resolution affects the outcome of
the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).  A dispute is genuine if the evidence is such that it could
cause a reasonable jury to return a verdict for either party.  Id.
at 252.

On a motion for summary judgment, the court views all evidence
and inferences in a light most favorable to the nonmoving party.
Id. at 255.  The nonmoving party, however, may not rest upon mere
denials or allegations in the pleadings but must set forth specific

facts sufficient to raise a genuine issue for trial.  Celotex, 477

U.S. at 324.  A party asserting that a genuine dispute exists - or

cannot exist - about a material fact must cite "particular parts of

materials in the record."  Fed R. Civ. P. 56(c)(1)(A).  If a

plaintiff cannot support each essential element of a claim, the

court must grant summary judgment because a complete failure of

proof regarding an essential element necessarily renders all other

facts immaterial.  Celotex, 477 U.S. at 322-23.

## II.  Misappropriation of Trade Secrets

Denson argues that LDI misappropriated its trade secrets in

violation of the Minnesota Uniform Trade Secrets Act (MUTSA).  To

prevail on this claim, Denson must show the existence of a trade

secret and improper acquisition, disclosure, or use of the trade

secret.  Minn. Stat. § 325C.01, subd. 3; Electro-Craft Corp. v.

Controlled Motion, Inc., 332 N.W.2d 890, 897 (Minn. 1983).  A trade

secret is information that must (1) not be generally known or

readily ascertainable, (2) derive independent economic value from

its secrecy, and (3) be the subject of reasonable efforts to

maintain its secrecy.  Minn. Stat. § 325C.01, subd. 5; Electro-

Craft, 332 N.W.2d at 899.

Denson argues that LDI, via To, misappropriated the following

trade secrets:  (1) "price lists by factory, customer, and product

type, price discounts, and shipping and invoice processes"; (2)

"financial information, including profit margins, direct costs and

expenses, salaries, payroll expenses, office rent, office overhead, and other internal expenses"; (3) "quality control procedures, inspection reports, and inspection checklists"; and (4) "engineering drawings of the manufacturing process." DesLauriers Decl. Ex. 28, at 7-8.

## A.    Failure to Identify Alleged Trade Secrets

LDI argues that Denson's claim fails because it has not adequately identified its alleged trade secrets. "To succeed on a trade secret misappropriation claim, a plaintiff must first define its alleged trade secrets with sufficient specificity." Bay Side Recycling Co., LLC v. SKB Envtl., Inc., No. 14-4550, 2014 WL 6772908, at *10 (D. Minn. Dec. 1, 2014). "Without a proven trade secret there can be no action for misappropriation, even if defendants' actions were wrongful." Electro-Craft, 332 N.W.2d at 897. LDI argues that Denson has not sufficiently described what "engineering drawings of the manufacturing process" are. The court agrees.

First, Denson director David Weil admitted that even he did not know what the term "engineering drawings of the manufacturing process" means. Weil Dep. at 149:22-150:2. Second, although Denson's 30(b)(6) witness identified one product for which the company created drawings, he did not provide an example of the drawings or explain their content with any particularity. Duffy Dep. at 80:15-25; see CHS Inc. v. PetroNet, LLC, No. 10-94, 2011 WL

1885465, at *8 (D. Minn. May 18, 2011) (finding no trade secret where plaintiff "fail[ed] to explain what the allegedly secret processes reflected in the[] documents are" and only gave "a few specific examples of the documents it claims are trade secrets"). Under these circumstances, the engineering drawings cannot form the basis of a misappropriation claim.

LDI next argues that Denson fails to adequately specify the financial information that it alleges to be a trade secret. Denson claims that this category covers information "about our employment, our staff levels, our salaries, our overhead, our expenses, ... our profit margins" and "[a]nything else which goes toward the viability, profitability of a business." Duffy Dep. at 47:11-17. Such generalizations are insufficient to establish a trade secret as a matter of law. See Menzies Aviation (USA), Inc. v. Wilcox, 978 F. Supp. 2d 983, 994-95 (D. Minn. 2013) (denying temporary restraining order where plaintiff "merely generalize[d] that information such as marketing information, internal reports, employment matters and financial condition were confidential"); CHS Inc., 2011 WL 1885465, at *7 (granting summary judgment where plaintiff did nothing more than "list general areas of information which contain unidentified trade secrets"). Although Denson submitted recent annual financial statements in response to LDI's motion, see Krummen Decl. Exs. 70-73, it does not specify the information included within those reports that should be considered

12

a trade secret.  See AMP, Inc. v. Fleischhacker, 823 F.2d 1199,

1203 (7th Cir. 1987) (finding insufficient "six single-spaced,

typewritten pages listing by general item and category hundreds of

pieces of ... internal information"); U.S. Gypsum Co. v. LaFarge N.

Am., Inc., 508 F. Supp. 2d 601, 636 (N.D. Ill. 2007) (stating

plaintiff cannot "point to an 11,000-page document covering many

diverse topics and assert that the entire document constitutes a

trade secret").  The court therefore cannot conclude that Denson's

engineering drawings and financial information, as identified by

Denson, are trade secrets.

### B.    Remaining Trade Secrets

The court also finds that Denson has not established that the

remaining categories of information are trade secrets.[4]  First,

Denson fails to show that it adopted any measures, let alone

reasonable ones, to maintain the confidentiality of any of its

alleged trade secrets.  Denson provides no evidence that its

---

[4] To establish that its information is entitled to trade
secret status, Denson relies heavily on a declaration submitted by
its 30(b)(6) witness.  Many of the allegations made in the
declaration are either conclusory or contradict the witness's
deposition testimony.  See, e.g., Duffy Decl. ¶ 27 ("These
engineering drawings were not generally known or reasonably
ascertainable and provided Denson with a competitive advantage.");
id. ¶ 37 ("Denson had a policy against disclosing this information
to outside sources.").  As a result, the court will not consider
these statements.  See Ballard v. Heineman, 548 F.3d 1132, 1136
(8th Cir. 2008) ("[C]onclusory affidavits devoid of specific
factual allegations rebutting the moving party's evidence cannot
defeat a summary judgment motion."); City of St. Joseph v. Sw. Bell
Tel., 439 F.3d 475-76 (8th Cir. 2006) (disregarding affidavit that
contradicts prior deposition testimony without explanation).

employees signed confidentiality or non-disclosure agreements, that it adopted a policy requiring certain information to remain confidential, or that it marked any of its documents as confidential. Duffy Dep. at 128:3-129:2; Weil Dep. at 176:18-21, 180:12-181:21. Instead, Denson simply argues that the importance of confidentiality is widely understood among Hong Kong businesses. Weil Dep. at 180:17-181:21. This is insufficient as a matter of law. See Nw. Airlines v. Am. Airlines, 853 F. Supp. 1110, 1115 (D. Minn. 1994) ("Mere intention to keep material confidential is not enough to confer trade secret protection."); Electro-Craft, 332 N.W.2d at 901-09 (finding no violation where plaintiff did not maintain physical security of the premises, label documents confidential, or issue a policy statement regarding confidentiality).

Moreover, Denson has not adequately shown that its wholesale price list derived economic value from its secrecy. To satisfy this element, the list "must provide a competitive advantage" to Denson. Wyeth v. Natural Biologics, No. 98-2469, 2003 WL 22282371, at *19 (D. Minn. Oct. 2, 2003). Denson argues that its wholesale prices were valuable because the price list that To provided to LDI was allegedly derived from Denson's prices. Even if this is true, however, the record shows that LDI engaged in its own price negotiations with manufacturers long before To provided his list, and compared its prices against those that Denson offered LDI.

14

LaFontaine Dep. at 39:1-40:24.  Indeed, LDI conducted a review of To's list and noted that his proposed savings were close to those that LDI had obtained from negotiating directly with the Nanjing and EKO factories.  See id. at 43:4-6, Krummen Decl. Ex. 56.

LDI next argues that Denson's quality control procedures and training processes were readily ascertainable.  The court agrees. Although Denson's inspectors made detailed observations regarding each product, Denson used a procedure known as "MTD-STD-105E S2 AQL 1.0 & 4.0," a military standard that is readily available on the Internet.  See Weil Dep. at 47:5-25, 51:20-52:16; DesLauriers Decl. Exs. 31, 32; Krummen Decl. Exs. 74-77.  Thus, there is no credible dispute that each of Denson's alleged trade secrets fail to meet at least one of the required elements under Minnesota law.  As a result, summary judgment is warranted on Denson's misappropriation claim.[5]

## III. LDI's Fraud Counterclaims

LDI's first counterclaim alleges that Denson fraudulently misrepresented the manufacturer of certain hand truck shipments, which directly caused LDI's liability to customs authorities.  LDI specifically argues that Denson lied when it claimed that certain hand trucks shipped between 2005 and 2008 were manufactured by Taifa, which triggered lower antidumping duties than otherwise

---

[5] Because the court grants summary judgment on the misappropriation claim, summary judgment is also warranted on the claim for willful and malicious misappropriation.

would have applied.  To establish fraudulent misrepresentation, LDI

must demonstrate that

> (1) there was a false representation by a
> party of a past or existing material fact
> susceptible of knowledge; (2) made with
> knowledge of the falsity of the representation
> or made as of the party's own knowledge
> without knowing whether it was true or false;
> (3) with the intention to induce another to
> act in reliance thereon; (4) that the
> representation caused the other party to act
> in reliance thereon; and (5) that the party
> suffer[ed] pecuniary damage as a result of the
> reliance.

Hoyt Props., Inc. v. Prod. Res. Grp., LLC, 736 N.W.2d 313, 318

(Minn. 2007).

As an initial matter, the court finds that the shipments made

between 2005 to 2007 cannot form the basis of a fraud claim,

because there is no evidence in the record establishing that hand

trucks shipped during that period were not manufactured by Taifa.

For at least some of those transactions, Denson produced

certificates showing that Taifa sold the hand trucks to Denson.

See, e.g., Handler Decl. Ex. 36, at DENSON 553.  LDI notes that

shipping orders for every purchase from 2005 to 2008 state that all

hand trucks were shipped from the port of Huangpu, which is more

than 1,000 miles from Taifa.  See, e.g., Second DesLauriers Decl.

Exs. 7 at DENSON 25888, 12 at DENSON 22646.  As explained by

Denson, however, Taifa often accepted Valley Craft's smaller orders

only if they were included in bulk purchases made by EKO

Development, a distributor located near Huangpu.  Second Duffy

Decl. ¶¶ 6, 20-21; Duffy Dep. at 148:3-15, 149:21-24.  Thus, the location of the shipping port does not necessarily preclude a determination that the products were manufactured in Taifa. Further, the fact that Denson regularly relied on EKO Development between 2005 and 2008 does not credibly suggest that the same manufacturer produced all of the hand trucks at issue.

LDI also alleges that Customs determined the hand trucks were not produced by Taifa.  The court disagrees.  In its Notice of Penalty, Customs alleged that LDI failed to state the correct antidumping codes on some of the shipments.  Handler Decl. Ex. 24, at LDI 2923.  There was no determination as to where the hand trucks were manufactured.  Indeed, LDI admits that the result of its internal investigation following the Customs notice was inconclusive, and it settled the matter before Customs could make any final determination.  Id. Ex. 26, at LDI 2915.  The only actual evidence in the record suggests that the hand trucks ordered between 2005 and 2007 were in fact manufactured by Taifa.  As a result, those orders cannot form the basis of LDI's fraud claim.

The court also finds that Denson did not make fraudulent statements regarding who manufactured the hand trucks delivered in 2008.  Denson did not state that the hand trucks were manufactured by Taifa on its January 2008 invoice, nor did it claim that they were subject to a lower antidumping duty rate.  Handler Decl. Ex. 6.   Denson later informed LDI that the hand trucks were

17

manufactured by a separate factory in south China "who could not add the clause anymore." Id. Ex. 7. Despite this, LDI asked Denson to place the clause on all future orders, and Denson obliged. Id. Exs. 8-13. Thereafter, all invoices included a clause but did not indicate Taifa as the manufacturer. Id. Exs. 13-14. When LDI later asked whether specific hand trucks were subject to the higher duty rate, To confirmed that they were, but that "there should be no problem" because they were manufactured by a "south China" factory "that is not famous (compare[d] with Taifa)." Id. Ex. 15, at DENSON 7655. Because Denson did not represent to LDI that any of the hand trucks delivered in 2008 were manufactured by Taifa or subject to the lower antidumping duty rate, LDI cannot now claim to have been misled in that regard.

LDI's fraudulent omission claim also fails because there is no evidence suggesting that Denson intentionally concealed the manufacturer of the hand trucks shipped in 2008. Indeed, the January 2008 invoice did not state that the hand trucks were subject to the higher antidumping duty, nor did it state that they were manufactured by Taifa. There is simply no evidence to support the contention that Denson concealed the manufacturing location. As a result, summary judgment is warranted on the fraudulent omission claim.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1.   Denson's motion for summary judgment [ECF No. 124] is granted;

2.   LDI's motion for summary judgment [ECF No. 127] is granted; and

3.   Denson's motion to exclude [ECF No. 146] is denied as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: September 1, 2015


s/David S. Doty
David S. Doty, Judge
United States District Court